UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KERRY STEPHEN WRIGHT,

     Plaintiff,

v.

COMMISSIONER OF SOCIAL
SECURITY,

     Defendant.

Case No. 2:20-cv-11228
District Judge Victoria A. Roberts
Magistrate Judge Kimberly G. Altman

_____/

## REPORT AND RECOMMENDATION ON CROSS MOTIONS FOR SUMMARY JUDGMENT

I.     Introduction

This is a social security case.  Plaintiff Kerry Wright (Wright) brings this action under 42 U.S.C. § 405(g), challenging the final decision of Defendant Commissioner of Social Security (Commissioner) partially denying his application for Disability Insurance Benefits (DIB) under the Social Security Act (the Act).[1] Both parties have filed summary judgment motions (ECF Nos. 17, 20) which have

_____

[1] Wright was found to be disabled beginning on June 17, 2018, but sought benefits for a period beginning March 15, 2016; his challenge is to the finding of not being disabled from March 15, 2016 to June 17, 2018.

1

been referred to the undersigned for a Report and Recommendation under 28 U.S.C. § 636(b)(1)(B).

For the reasons set forth below, substantial evidence supports the Administrative Law Judge's (ALJ) conclusion that Wright was not disabled under the Act until June 17, 2018. Accordingly, it is RECOMMENDED that the Commissioner's Motion for Summary Judgment (ECF No. 20) be GRANTED, Wright's Motion for Summary Judgment (ECF No. 17) be DENIED, and that under sentence four of 42 U.S.C. § 405(g), the ALJ's decision be AFFIRMED.

## II.    Background

### A.    Procedural History

Wright was 47 years old at the time of his alleged date of onset of March 15, 2016. (ECF No. 13, PageID.214). He has a high school education and prior work experience as a chemical operator. (*Id*., PageID.223). He alleged disability due to manic depression, bipolar, right shoulder, right elbow, left leg, right leg, and left shoulder problems. (*Id*., PageID.222).

After Wright's DIB application was denied at the initial level on March 21, 2017, he requested an administrative hearing, which was held on October 29, 2018 before the ALJ. (*Id*., PageID.59). Wright testified at the hearing, as did his daughter Morgan Wright and a vocational expert (VE). (*Id*., PageID.76-110).

2

Their testimony will be summarized below.  On January 23, 2019, the ALJ issued a written decision finding that Wright was not disabled from the date he filed his application, July 27, 2016, to June 17, 2018, but became disabled on that date through the date of the decision, and was expected to last twelve months past the onset date.  (*Id*., PageID.59-70).  On March 18, 2020, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner.  (*Id*., PageID.47-49).  Wright timely filed for judicial review of the final decision.  (ECF No. 1).

## B.     Medical Evidence

Wright alleges disability based on both physical and mental impairments. The medical records pertaining to each set of impairments are summarized separately below.

### 1.  Physical Impairments

On March 27, 2012, Wright underwent single-view imaging of the pelvis, which showed severe left hip osteoarthritis with flattening of the femoral head and shallow acetabulum." (ECF No. 13, PageID.344).  The right hip was satisfactory, with only a small osteophyte "suggestive of an os acetabuli." (*Id*.).  Wright underwent additional pelvic imaging on May 21, 2012, having had left total hip replacement in the interim.  (*Id*., PageID.346).  The imaging in May found

3

postoperative changes in the left hip and intact hardware with no evidence of loosening.  (*Id*.).  Mild degenerative changes were found at the bilateral sacroiliac and right hip joints.  (*Id*.).

On July 30, 2013, an MRI of Wright's right (dominant) shoulder revealed a "[f]ull thickness tear with retraction of the infraspinatus tendon," with "atrophy of the infraspinatus muscle," and a "[s]mall partial thickness tear along the under surface of the supraspinatus tendon."  (*Id.*, PageID.388).  Despite this, he continued to perform his regular medium exertional work for over three years.

Five years later, on March 19, 2018, x-rays of Wright's bilateral hips and pelvis revealed "2mm of lucency surrounding the distal femoral component of the left hip arthroplasty which could be on the basis of loosening or postsurgical appearance."  (*Id*, PageID.681-682).  The right hip appeared grossly unremarkable.  (*Id*.).  On March 29, 2018, Wright was examined by physician assistant Jason E. Maxa at the Covenant Center for Advanced Orthopedics.  (*Id.*, PageID.545).  He complained primarily of right shoulder pain he had been experiencing for over five years.  (*Id.*, PageID.545).  Wright stated that his pain originated due to a fall from a bridge and that his doctor had recommended surgery, but Wright chose not to undergo the surgery "as he did not want to take time off of work."  (*Id*.).  He also complained of left hip and knee pain, and that his knee gave way periodically.

4

(*Id.*).  Maxa found that Wright's right shoulder had "180 degrees of active forward flexion, 120 degrees of abduction actively, internal rotation to the lumber spine, and external rotation to the cervical spine.  [Wright] ha[d] 5/5 strength testing supraspinatus, and 4/5 strength testing infraspinatus.  Sensation [was] normal," and "[neurovascular] status [was] intact in the right upper extremity."  (*Id.*, PageID.547).  Maxa also examined the lower left extremity, which revealed no appreciable effusion, full terminal extension, and a modest amount of crepitus.  (*Id.*).  There was no patellar apprehension, peripatellar tenderness, no medial joint line or lateral joint line tenderness, but some tenderness superior to the greater trochanter, and "relatively limited range of motion of the left hip with modest pain."  (*Id.*).  Sensation was normal and neurovascular status was intact in the left leg.  (*Id.*).  In addition, Wright underwent an x-ray of the right shoulder, which showed moderate osteoarthritis at the acromioclavicular joint and possible impingement upon the distal end of the acromion.  (*Id.*).

Wright returned to the Covenant Center for Advanced Orthopedics on April 16, 2018, and was seen by Brian deBeaubien, M.D.  (*Id.*, PageID.540).  This visit was to address Wright's bilateral hip pain.  Wright stated that his right hip pain began six to seven years ago, and he rated it at a six to seven out of ten.  (*Id.*).  His left hip pain began two to three years ago, despite the total hip replacement in

5

2012, and he rated that pain at an eight out of ten, describing it as achy in nature. (*Id*.).  Wright stated that he had no history of back trouble and presented ambulating independently.  (*Id*.).  Wright had x-rays taken of both hips, showing no signs for concern in the left hip, and unremarkable results for the right hip as well.  (*Id*., PageID.543).  Dr. deBeaubien opined that Wright's symptoms stemmed from his lumbar spine, possibly due to stenosis, and not the hips.  (*Id*.).

Wright then saw Colleen Linehan, M.D. on May 3, 2018, to discuss his latest right shoulder MRI.  (*Id*., PageID.537).  Wright's pain was at a seven out of ten, with numbness, tingling, swelling, popping, and clicking with range of motion. (*Id*.).  He used ice for pain, as well as aspirin and ibuprofen.  (*Id*.).  Dr. Linehan also noted that he had been to the ER for neck pain a few days ago, and currently had neck pain and scapular pain as well.  (*Id*.).  Wright's right shoulder MRI was similar to the last one, five years prior, with findings of "full-thickness tear in the infraspinatus tendon unchanged in extent since previous [MRI]," "predominantly degenerative changes of the supraspinatus tendon," "[s]evere fatty infiltration of the infraspinatus muscle and mild atrophy of the supraspinatus muscle," and interval development of a partial intrasubstance tear in the subscapularis tendon. (*Id*., PageID.538).  He also had moderate osteoarthritis of the acromioclavicular joint.  (*Id*.).  Dr. Linehan recommended Aspercreme with lidocaine and high dose

Tylenol for pain, as well as a right rotator cuff repair, but noted that the rotator cuff will not heal unless he decreases his smoking from a pack per day to half a pack per day or less.  (*Id*.).

On June 17, 2018, Wright underwent a cervical spine MRI, which disclosed degenerative changes at the C3-C4 to C5-C6 discs, with severe spondylotic compromise of the left C6 neural foramina, as well as mild and moderate herniations and compromises elsewhere.  (*Id*., PageID.525-526).  On June 26, 2018, he had a lumbar spine MRI, showing that all levels of the lumbar spine (L1-L2 to L5-S1 levels) had severe bilateral facet hypertrophic changes.  (*Id*., PageID.524).  Based on these test results, the ALJ adjusted the RFC to include that Wright would "miss 4 or more days of work per month" from June 17, 2018 onward, which rendered Wright disabled as of that date.  (*Id*., PageID.67, 69).

### 2.  Mental Impairments

On April 23, 2015, almost one year prior to his alleged onset date, Wright was admitted to the emergency room (ER) in an intoxicated state for self-injury, having caused lacerations to both of his wrists.  (ECF No. 13, PageID.396-401).  He was brought to the ER by police in a depressed, angry, frustrated, and hostile state.  (*Id*.).  Upon discharge, his condition had improved, and he denied intent to self-harm, but was still notably hostile.  (*Id*., PageID.399).

7

Later that year, on October 7, 2015, Wright was seen by Mark H. Gerold, M.D., who noted a chronic medication problem, with the prescribed Remeron and Seroquel making him groggy to the extent that "work is asking him to take [a] leave of absence." (*Id*., PageID.441). Dr. Gerold noted Wright's history of anxiety and also that Wright was nervous and anxious at that visit. (*Id*.). Seroquil was discontinued in favor of Librium, but Remeron was continued due to Wright's anxiety. (*Id*., PageID.442).

On September 17, 2015, Wright was admitted to the hospital suffering acute pancreatitis, with symptoms that were "likely secondary to alcoholic hepatitis." (*Id*., PageID.402-404). He admitted to drinking "about a fifth of vodka a day," was counseled against nicotine and alcohol abuse, and had visited Alcoholics Anonymous two days prior to this hospitalization, though was "not ready to quit alcohol" at that time. (*Id*., PageID.403).

Wright saw Dr. Gerold again on October 29, 2015, and though his alcoholism was in remission, an argument with his daughter had caused him to punch a mirror. (*Id*., PageID.436). Wright felt depressed, anhedonia, lack of focus, appetite changes, and fatigue, but no suicidal thoughts. (*Id*.). On examination, his speech, behavior, judgment, and thought content were normal, but

8

his mood was anxious and depressed and he exhibited a flat affect. (*Id.*, PageID.437). Cognition and memory were also normal. (*Id.*).

Records reflect that on January 5, 2016, Wright relapsed and was taken to the ER for alcohol abuse, seeking detox. (*Id.*, PageID.413). He stated that he "drinks to treat anxiety." (*Id.*, PageID.414). With this returned his abdominal pain, which he returned to the ER for on January 25, 2016, though he had been suffering it for a "couple weeks." (*Id.*, PageID.415).

Wright returned to Dr. Gerold on April 13, 2016, approximately one month after losing his job and the alleged date of disability onset. (*Id.*, PageID.434). He reported having constant anxiety, and that although his medications provided significant relief, it caused him to make errors at work. (*Id.*). He found that "alcohol is the only thing that works," and had poor concentration, depression, anhedonia, hopelessness, and could not sleep. (*Id.*). He also had mood swings because of his daughter and a racing mind, but no suicidal thoughts. (*Id.*). On examination, he had normal behavior, judgment, and thought content, with a depressed mood. (*Id.*, PageID.435). His alcoholism was in remission, although he had just lost his job a month prior due to reporting for work with alcohol on his breath. (*Id.*, PageID.434-436).

9

Wright was seen again on May 18, 2016, for a depression follow up, reporting feeling depressed, anhedonia, hopelessness, guilt, and anger, but no suicidal thoughts. (*Id.*, PageID.433). He was not on medication but had tried a friend's Seroquel, which helped him sleep, and had been off of alcohol now for two months. (*Id.*). He was again normal in terms of behavior, judgment, and thought content, with an anxious, depressed mood and an angry affect. (*Id.*).

Dr. Gerold referred Wright to psychiatrist Mohammad Jafferany, M.D., who found that he had appropriate dress, adequate grooming and hygiene, cooperative behavior, normal speech, a "sad/depressed" mood, "flat/blunted" affect, goal directed and logical thought process, "poor confidence/esteem," and poor insight. (*Id.*, PageID.474). Wright was fully oriented with intact memory, attention, concentration, and language. (*Id.*, PageID.475). Wright reported a history of impulsivity and frequent fighting, as well as a poor mood and previous suicidal ideation, though without intent or plan. (*Id.*, PageID.471). He purposefully cut his arm once, but denied other incidents of self-harm. (*Id.*, PageID.472). Based on his examination, Dr. Jafferany prescribed Zoloft at bed, discontinued Prozac, and continued Seroquel at bed. (*Id.*, PageID.477-478).

Wright continued to see Dr. Jafferany, and on June 21, 2016, had similar findings but improved insight and judgment, despite being unable to afford

medications.  (*Id*., PageID.468-469).  On August 18, 2016, Wright saw nurse

practitioner Karen Olson in Dr. Jafferany's office, with similar objective findings,

but a "worsening" condition that resulted in his medications being changed to

Elavil and Ativan.  (*Id*., PageID.461-464).  Wright then did not return to Dr.

Jafferany's office until March 15, 2017, due to having lost his insurance benefits.

(*Id*., PageID.507).  He reported to nurse practitioner Gwendolyn Pryor that he

continued to be depressed and did not want to be around people.  (*Id*.).  He had

similar objective results to prior visits: appropriate dress, adequate grooming and

hygiene, cooperative behavior, normal speech, a "sad/depressed" mood and affect,

goal directed and logical thought process, with no abnormal thought content and

intact insight and judgment.  (*Id*., PageID.509).  Wright was again fully oriented

with intact memory, attention, concentration, and language.  (*Id*., PageID.510).

Seroquel was continued, and Vistaril was prescribed for anxiety.  (*Id*.,

PageID.512).

Wright was also treated for mental health at the Saginaw County

Community Mental Health Authority from April 5, 2018 to July 25, 2018.  At

intake, an initial psychosocial assessment was done.  (*Id*., PageID.646).  Wright

presented appropriately dressed and groomed, with a flat affect, little eye contact,

and soft, pressured speech.  (*Id*.).  He stated that he had weekly panic attacks,

racing thoughts, problems sleeping, a lot of anxiety, and was very depressed.  (*Id.*).

He felt helpless, hopeless, and worthless.  (*Id.*).  Notes indicate that he had current

ideation of harm to self and others, but nothing further, and that he independently

exercised personal/self-care.  (*Id.*, PageID.652-653).  He also independently

exercised living skills such as shopping, laundry, and cleaning, and independently

accessed healthcare or medical services.  (*Id.*).  His general behavior was found to

be cooperative, but agitated and guarded; perceptions were normal; thought

process was circumstantial; mood was fearful and anxious; judgment was fair; and

impulse control and insight were poor.  (*Id.*, PageID.657-658).  He was ultimately

diagnosed with "major depressive disorder," "unspecified mood (affective)

disorder," and alcohol dependence, with a GAF score of 41.  (*Id.*, PageID.660-

661).

 At the time of his last evaluation on July 25, 2018, Wright noted some

improvement with an increase in Celexa, but that it had dissipated, and that Vistaril

was not effectively treating his anxiety.  (*Id.*, PageID.567).  He was noted as being

cooperative, with a mood he described as "not good."  (*Id.*, PageID.568).  His

affect was blunted, but his thought process was linear and coherent, speech was

normal, and he denied active suicidal or homicidal ideations.  (*Id.*).  He was alert

and oriented to person, time, situation, and place; his insight was good; and his judgment was fair. (*Id*.).

### 3.   Hearing Testimony

At the hearing on October 29, 2018, Wright testified that in order to help him sleep and to help ease his pain, he began drinking, and that from drinking one night prior to work, he arrived with alcohol on his breath the next morning. (*Id*., PageID.84-85). Due to the company's zero tolerance policy, in addition to his prior issues with absences and a lack of focus at work, he was terminated on March 15, 2016. (*Id*.). He testified that prior to his termination, some of the medications he had tried for sleep and pain had greatly interfered with his ability to work. (*Id*., PageID.86). He was also being treated for his right shoulder pain, with his doctor recommending surgery, but because Wright had undergone hip surgery just two years prior and did not want to miss more work for surgery, he declined. (*Id*.).

Upon questioning from his attorney, Wright testified that he spends approximately half of his day laying down in an attempt to get comfortable, ease the pain, or nap in order to supplement his poor sleep. (*Id*., PageID.89). He further stated that he can sit without needing to change position for at most one hour, and stand without leaning for fifteen minutes. (*Id*., PageID.89-90). He guessed that he could walk a "couple blocks" but had not done so in a year. (*Id*.,

PageID.90).  He drives to appointments twice per week, but does not like to because he is not thinking straight and his neck pain makes it difficult to turn his head.  (*Id*.).  Wright also mentioned mental issues with reading, physical issues with writing, and no longer socializing with others due to not wanting to be around other people.  (*Id*., PageID.90-92).

Wright went on to describe his neck pain, finding that to be his number one issue.  (*Id*., PageID.96).  He described it as aching and causing numbness down to his hands as well as "terrible headaches."  (*Id*.).  The neck pain is "severe" approximately four times per week.  (*Id*.).  He then described his lower back pain as being "severe" a few times per week, which results in a shooting pain down his legs to his right calf and left knee.  (*Id*., PageID.97-98).  Mentally, Wright stated, "I don't want to do anything.  I'm afraid to do things because I'm afraid to cause more pain."  (*Id*., PageID.98).  He testified that his depression adversely affects his ability to understand, remember, and apply information, and that he doesn't get along with other people very well anymore.  (*Id*., PageID.99).

Wright's daughter then testified, stating that Wright spends "pretty much all of his time" on the couch, is no longer active, and used to socialize but no longer does.  (*Id*., PageID.102-103).  He speaks to his brother occasionally, not often, and "dreads looking to see who's calling" when the phone rings.  (*Id*., PageID.103).

14

Then the VE testified, noting that for a hypothetical matching the ALJ's RFC, past work would be ruled out but "some inspection positions" would be available.  (*Id.*, PageID.106-107).  However, if the qualifier was added to that RFC that the individual would be expected to miss four or more days of work per month, that would be work preclusive.  (*Id.*, PageID.107).  The VE also testified that being off task for fifteen percent or more of the workday would be work preclusive.  (*Id.*, PageID.108).

### III.    Framework for Disability Determinations (the Five Steps)

Under the Act, DIB is available only for those who have a "disability."  *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The Commissioner's regulations provide that a disability is to be determined through the application of a five-step sequential analysis:

> Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits ... physical or

15

mental ability to do basic work activities," benefits are denied without further analysis.

Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.

Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that the claimant can perform, in view of his or her age, education, and work experience, benefits are denied.

*Carpenter v. Comm'r of Soc. Sec.*, No. 08-10279, 2008 WL 4793424, at *4 (E.D. Mich. Oct. 31, 2008), citing 20 C.F.R. § 404.1520; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "The burden of proof is on the claimant throughout the first four steps. . . . If the analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [Commissioner]." *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

Following this five-step sequential analysis, the ALJ found that Wright was not disabled under the Act prior to July 17, 2018. At Step One, the ALJ found that Wright had not engaged in substantial gainful activity since his alleged onset date

16

of March 15, 2016.  (ECF No. 13, PageID.62).  At Step Two, the ALJ found that

he had the severe impairments of degenerative disc disease of the lumbar and

cervical spine, degenerative joint disease of the right shoulder, degenerative joint

disease of the left hip—post-arthroplasty, depression, and anxiety.  (*Id.*)  At Step

Three, the ALJ found that Wright's impairments, whether considered alone or in

combination did not meet or medically equal a listed impairment.  (*Id.*, PageID.62-

63).

The ALJ then assessed Wright's residual functional capacity (RFC),

concluding that prior to June 17, 2018, he was capable of performing sedentary

work with the following additional limitations:

> [H]e could only occasionally climb ladders, ropes or scaffolds.  He
> could only occasionally crouch, crawl or kneel.  He could only
> frequently reach with the right dominant except no overhead reaching.
> He could only occasionally operate foot pedals with the left lower
> extremity.  He could perform only simple, routine tasks. He could only
> occasionally interact with coworkers but have no interaction with the
> public.

(*Id.*, PageID.64).  Beginning on July 17, 2018, the ALJ found that Wright had

essentially the same RFC, but with the additional limitation that Wright "will miss

4 or more days of work per month."  (*Id.*, PageID.66-67).

At Step Four, the ALJ found that Wright was unable to perform any past

relevant work under either RFC.  (*Id.*, PageID.67).  At Step Five, the ALJ

determined that prior to June 17, 2018, Wright was capable of performing jobs that existed in significant numbers in the national economy.  (*Id*., PageID.68). Beginning on that date, there were no jobs existing in significant numbers in the national economy that Wright could perform.  (*Id*., PageID.69).  As a result, the ALJ concluded that Wright was not disabled under the Act prior to June 17, 2018, but became disabled on that date and remained so through the date of the decision. (*Id*.).

## IV.    Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative decision under 42 U.S.C. § 405(g).  Although the court can examine portions of the record that were not evaluated by the ALJ, *Walker v. Sec. of Health & Hum. Servs.*, 884 F.2d 241, 245 (6th Cir. 1989), its role is a limited one.  Judicial review is constrained to deciding whether the ALJ applied the proper legal standards in making his or her decision, and whether the record contains substantial evidence supporting that decision.  *Tucker v. Comm'r of Soc. Sec.*, 775 F. App'x 220, 224–25 (6th Cir. 2019)); *see also Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007) (noting that courts should not retry the case, resolve conflicts of evidence, or make credibility determinations); *Biestek v. Comm'r of Soc. Sec.*, 880 F.3d 778, 783 (6th Cir. 2017) (same).

18

An ALJ's factual findings must be supported by "substantial evidence." 42

U.S.C. § 405(g).  The Supreme Court has recently explained what that term means:

> Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains sufficient evidence to support the agency's factual determinations.  And whatever the meaning of substantial in other contexts, the threshold for such evidentiary sufficiency is not high.  Substantial evidence, this Court has said, is more than a mere scintilla.  It means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.

*Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal quotations omitted).

In making "substantial evidence" the relevant standard, the law preserves the

judiciary's ability to review decisions by administrative agencies, but it does not

grant courts the right to review the evidence de novo.  *Moruzzi v. Comm'r of Soc.*

*Sec.*, 759 F. App'x 396, 402 (6th Cir. 2018) ("The substantial-evidence standard ...

presupposes that there is a zone of choice within which the decisionmakers can go

either way, without interference by the courts.") (quoting *Blakley v. Comm'r of*

*Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009)).  An ALJ's factual findings are

therefore subject to multi-tiered review, but those findings are conclusive unless

the record lacks sufficient evidence to support them.  *Biestek*, 139 S. Ct. at 1154.

Although the substantial evidence standard is deferential, it is not trivial. The

Court must " 'take into account whatever in the record fairly detracts from [the]

weight' " of the Commissioner's decision.  *TNS, Inc. v. NLRB*, 296 F.3d 384, 395

19

(6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)).  Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding even if there is substantial evidence in the record that would have supported an opposite conclusion."  *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (internal quotations omitted).  Finally, even if the ALJ's decision meets the substantial evidence standard, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right."  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (internal quotations omitted).

## V.    Analysis

### A.    General Overview

As an initial matter, the parties agree that Wright is disabled.  The parties disagree on when that disability began.  Wright contends that the disability began on March 15, 2016, which happens to be the date he was terminated from his employment.  The ALJ determined that Wright became disabled as of June 17, 2018, when the results of an MRI of his spine showed significant degenerative disease.  With this backdrop in mind, the undersigned will consider Wright's specific assignments of error.

20

Wright first assigns error to the ALJ's listing analysis, arguing that he meets or has the equivalent of the listed impairments under 1.04 (disorders of the spine), 12.04 (affective disorders), and 12.06 (anxiety-related disorders).  Wright also argues that the RFC is unsupported by substantial evidence regarding his physical and mental limitations, as both independently support a finding of disability from the alleged onset date of March 15, 2016.  The Commissioner responds that Wright has not demonstrated that he meets or equals any listing; that meeting listing 1.04 based on the June 2018 MRI scans would be at worst harmless error, as Wright was found to be disabled from that date; that each RFC is supported by substantial evidence; and that Wright attempts to impermissibly shift the burden to the Commissioner to prove the RFC by conflating it with Step Five.

### B.    Impairment Listings

At Step Three of the sequential evaluation process, Wright bears the burden of establishing that her impairment meets or medically equals a listing.  *See Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 548 (6th Cir. 2004).  To prevail, he must prove that his impairments meet "all of the specific medical criteria" in the listing, or "present medical findings equal in severity to all of the criteria for the one most similar listed impairment."  *Sullivan v. Zebley*, 493 U.S. 521, 530-31 (1990) (emphasis in original).

21

The Sixth Circuit has recognized that "medical equivalence" can be found in three ways:

> (1) the claimant has a listed impairment but does not exhibit the specified severity or findings, yet has "other findings" that are "at least of equal medical significance" to the criteria;
>
> (2) the claimant has a non-listed impairment that is "at least of equal medical significance" to a listed impairment; or
>
> (3) the claimant has a combination of impairments which do not individually meet a Listed Impairment, but are "at least of equal medical significance" to a listing when viewed in totality.

*Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 n. 2 (6th Cir. 2011) (quoting 20 C.F.R. § 404.1526); *see also* Social Security Ruling ("SSR") 17-2p, 2017 WL 3928306, at *2 (Mar. 27, 2017).

### 1.  Listing 1.04

Wright argues that the ALJ's application of listing 1.04 was cursory and erroneous.  To meet listing 1.04, must show a disorder of the spine, "(e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord," with:

> A.  Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine); or,

22

B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours; or,

C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 C.F.R. § Pt. 404, Subpt. P, App. 1 § 1.04.

Regarding 1.04A, the ALJ found "no evidence of a nerve root compression characterized by pain, limitation of motion of the spine, motor loss, sensory or reflex loss, and positive straight leg-raise testing." (ECF No. 13, PageID.62). Notably, listing 1.04A requires each of the conditions to be met. Though Wright focuses on listing 1.04A and cites evidence of diminished bicep, knee, and ankle reflexes as well as pain, he does not provide evidence of limitation of motion of the spine, no sensory loss, and admits that there is no record of positive straight leg testing. In fact, as the Commissioner notes, James Brasseur, D.O. found negative leg-raising signs upon examination. (*Id.*, PageID.500). Further, the diminished reflexes cited by Wright were from July 16, 2018, by which point he has already been found disabled. (*Id.*, PageID.557-560). Thus, Wright cannot show that he meets listing 1.04A.

23

As to 1.04B and C, the ALJ found no signs of "spinal arachnoiditis or lumbar spinal stenosis resulting in pseudoclaudication." (*Id.*, PageID.62). Wright does not specifically address these conditions. To the extent that Wright argues for a finding of equivalency, Wright has only shown that his impairments meet some of the criteria for listing 1.04, and has not rebutted the ALJ's conclusion that his impairment "does not reach the severity" of 1.04. (*Id.*). *See Bailey v. Comm'r of Social Security*, 413 F. App'x 853, 855 (6th Cir. 2011) ("To establish the equivalent of nerve-root compression, [the claimant] must demonstrate a lack of motor strength, a lack of sensory functions, and a positive straight-leg raising test, among other things." (citing listing 1.04A)); *O'Brien v. Comm'r of Soc. Sec.*, 819 F. App'x 409, 415 (6th Cir. 2020) ("[F]or a claimant to qualify for benefits by showing that his unlisted impairment, or combination of impairments, is 'equivalent' to a listed impairment, he must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment." (quoting *Sullivan v. Zebley*, 493 U.S. 521, 531 (1990)) (emphasis in original)).

Further, if the listing were found to be met or medically equaled based on the June 2018 cervical and lumbar spine MRIs, any error in the ALJ's analysis would be harmless, as Wright was found to be disabled as of June 17, 2018, the date of the first of those MRIs. Remand for listing 1.04 analysis on this basis

24

would have no effect on the result of the ALJ's ruling.  *See NLRB v. Wyman-Gordon*, 394 U.S. 759, 766 n.6 (1969) (when "remand would be an idle and useless formality," courts are not required to "convert judicial review of agency action into a ping-pong game").

### 2.  Listings 12.04 and 12.06

For these listings, the regulations contain identical criteria under paragraph "B" but differing criteria under paragraph "C"; the criteria under either B or C must be met to demonstrate that the listing is met.  As the ALJ explained, the listings can be met by having one extreme or two marked limitations among the four categories of functioning:

> [1]  understanding, remembering, or applying information;  [2] interacting with others;  [3] concentrating, persisting, or maintaining pace; or [4] adapting or managing themselves.  A marked limitation means functioning in this area independently, appropriately, effectively, and on a sustained basis is seriously limited.  An extreme limitation is the inability to function independently, appropriately or effectively, and on a sustained basis.

(ECF No. 13, PageID.63); *see* 20 C.F.R. § Pt. 404, Subpt. P, App. 1 §§ 12.04B, 12.06B.  Regarding understanding, remembering, or applying information, the ALJ found Wright to have moderate limitation, as he did not need reminders to take care of his needs or grooming or to go where he is required to go, was able to pay bills and manage his money, and was generally found to have normal thought content, cognition, and memory.  (*Id.*).  Wright did not challenge this finding.

a.  Interacting with Others

As to interacting with others, the ALJ again found a moderate limitation,
based on Wright's normal speech and behavior in medical records, having never
been fired for inability to get along with others, and spending some time with
others, though he has problems getting along with family and friends at times due
to anger issues.  (*Id.*).  In support, the ALJ cites records showing normal behavior,
cognition, judgment, and thought content.  (*Id.*, citing PageID.437, 461-462, 492,
543).  The Commissioner notes that this finding is supported by the state agency
consultant opinion of Joe DeLoach, Ph.D., who reviewed Wright's medical records
on February 1, 2017 and also found a moderate limitation on interacting with
others, (*Id.*, PageID.123), based on treatment notes and the ability to ask simple
questions, request assistance, get along with coworkers or peers, and maintain
socially appropriate behavior (*Id.*, PageID.123-126).  The ALJ found this opinion
"somewhat consistent with the claimant's lack of inpatient psychiatric
hospitalizations during the relevant period, treatment observations, mental status
examination findings, and the claimant's daily activities."  (*Id.*, PageID.66).

Wright challenges this finding, noting that he mainly spends time with his
daughter and granddaughter, rarely leaves the house other than for doctor's visits,
and secludes himself from others, watching television as his main hobby.  (ECF

26

No. 17, PageID.730).  These limitations, alone, do not necessarily support more than a moderate limitation in interacting with others.  Though Wright is clearly not proactively social or outgoing, he maintains appointments with doctors and social workers, is consistently found to be cooperative, (*see, e.g.*, ECF No. 13, PageID. PageID.474, 509, 568, 657-658), maintains relationships with family members, and showed no difficulty working with others when employed.

As the Commissioner notes, similar facts have not precluded a finding of moderate limitations in this area in the Sixth Circuit.  The Commissioner cites *Bowman v. Comm'r of Soc. Sec.*, 683 F. App'x 367, 372 (6th Cir. 2017), where the claimant similarly "tended to seclude herself" but was "consistently cooperative" and "could maintain socially appropriate behavior and work with others to avoid conflict."  Similarly, in *Thacker v. Soc. Sec. Admin.*, 93 F. App'x 725, 729 (6th Cir. 2004), the ALJ's decision finding "moderate difficulties in social functioning" was upheld where the claimant "testified that he stays in the house," but participated in outpatient treatment, saw a therapist one to two times per month for counseling, and was found "cooperative, friendly, alert, and attentive" in treatment notes. Lastly, the Commissioner cites *Charara v. Comm'r of Soc. Sec.*, No. 18-13481, 2018 WL 5603624, at *4 (E.D. Mich. Oct. 30, 2018), where despite demonstrating "a sad mood and labile affect," the fact that the claimant was "alert and cooperative

27

with normal eye contact" supported a finding of moderate limitation in interacting with others.

Wright also argues that the records cited by the ALJ do not reflect "normal" findings in general, but only specifically at the times of treatment. However, Wright does not supplement this argument with findings of abnormal behavior, cognition, judgment, or thought content. Instead, he invites the Court to judge his mental condition based on his past acts. (ECF No. 17, PageID.730-731). This is essentially "a thinly-veiled invitation for this Court to play doctor," *Gazvoda v. Sec'y of Homeland Sec.*, 258 F. Supp. 3d 799, 814 (E.D. Mich. 2017), which would be improper. *Fox v. Colvin*, No. 15-10968, 2016 WL 837164, at *3 (E.D. Mich. Mar. 4, 2016). The Court "can only weigh the credibility of medical testimony and evidence proffered by others." *Schultz v. Sec'y of Health & Hum. Servs.*, 894 F.2d 408 (6th Cir. 1990).

b.  Concentration, Persistence, and Pace

As for concentrating, persisting, and maintaining pace, the ALJ found Wright to have only mild limitation. (ECF No. 13, PageID.63). He elaborated that Wright could pay attention for a half hour or longer and can concentrate well enough to drive a car and watch television. (*Id.*). Wright contends that these abilities are not indicative of an ability to concentrate. But the Sixth Circuit has

28

found that the ability to "concentrate enough to drive for twenty minutes and watch a thirty-minute television show" refuted a claimant's allegation of difficulty concentrating. *Hedges v. Comm'r of Soc. Sec.*, 725 F. App'x 394, 395–96 (6th Cir. 2018); *see also Thacker*, 93 F. App'x at 729 (citing claimant watching television and driving for short periods of time as relevant). Further, while Wright's concentration was found to be poor at one visit, (*Id.*, PageID.434), it was fair at another, (*Id.*, PageID.462), and intact on three other occasions (*Id.*, PageID.468, 475, 510). Likewise, Dr. DeLoach found that Wright's "concentration and persistence [] were adequate for simple work tasks." (*Id.*, PageID.125). Wright offers no evidence from the record to support additional limitations in concentration, persistence, and pace.

### c. Adapting or Managing Oneself

Finally, the ALJ found a mild limitation in adapting or managing oneself, noting again that Wright can drive a car, in addition to preparing simple food, performing chores, going out alone, taking medications, handling his own financial matters, and shopping for groceries or household items. (ECF No. 13, PageID.63).[2] Despite Wright's protestations, similar activities to these have been

---

[2] The Commissioner notes that the ALJ stated, "[t]he claimant helps to take care of children," but the Commissioner found no support for this claim in the record. However, one factual error does not require remand where the ALJ's conclusion

found to support less-than-marked impairment in this domain. *See Drain v. Comm'r of Soc. Sec.*, No. 14-CV-12036, 2015 WL 4603038, at *5 (E.D. Mich. July 30, 2015) (claimant's ability to "prepare sandwiches and precooked meals on a daily basis," "go grocery shopping every couple weeks," and manage finances rebutted opinion that she suffered a marked limitation). Wright notes that he has been far from perfectly compliant with taking medications, but this alone is insufficient to sustain a marked or extreme limitation in adapting or managing oneself. *See Hudson v. Comm'r of Soc. Sec.*, No. CV 18-12124, 2019 WL 4866233, at *3 (E.D. Mich. May 21, 2019) (addressing similar non-compliance and upholding ALJ's conclusion of moderate limitation in adaptive functioning where, as here, ALJ's conclusion in that domain was more favorable to claimant than that of a state agency reviewing expert), *report and recommendation adopted,* 2019 WL 4051743 (E.D. Mich. Aug. 27, 2019).

Based on the above, there is no reason to disturb the ALJ's consideration of the "B" criteria regarding Wright's depression and anxiety. The ALJ then found that Wright did not meet the "C" criteria for either listing, but this finding is not challenged and should therefore remain undisturbed as well.

---

remains supported by substantial evidence. *Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 714 (6th Cir. 2012). Thus, even if unsupported, this would be harmless error.

C.     RFC

Wright contends that the ALJ's assessed RFC is not based on substantial

evidence.  A person's RFC is the most he is able to do despite any physical,

mental, or environmental limitations resulting from his impairments.  20 C.F.R. §

404.1545(a)(1).  The ALJ is responsible for assessing residual functional capacity

and takes into account all of the relevant medical and other evidence in doing

so.  *Id.* §§ 404.1545(a), 404.1546(c).  This includes statements about the claimant's

abilities provided by medical sources, whether or not they are based on formal

medical examinations, and non-medical statements from the claimant or others,

including those regarding daily activities.  *Id.* § 404.1545(a)(3); Soc. Sec. Rul. 96-

8p, 1996 WL 374184, at *5 (July 2, 1996).  It is the claimant's burden at this stage

to establish his or her RFC.  *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th

Cir. 1999).

First, Wright accuses the ALJ of ignoring Wright and his daughter's

testimony, when in fact the ALJ summarized and relied upon that evidence.  (ECF

No. 13, PageID.64, 66).  However, as to Wright's testimony, the ALJ found it

inconsistent with the objective medical evidence and his activities of daily living.

(*Id.*, PageID.65).  He supported this with citations to the record showing both

physical and mental status examinations with unremarkable results prior to the date

of disability, and noted a relatively static and conservative treatment regimen despite Wright's long stretches of non-compliance.  (*Id*.).  Lack of medication compliance is relevant to the subjective symptom analysis.  *See Biestek v. Comm'r of Soc. Sec.*, 880 F.3d 778, 789 (6th Cir. 2017), *aff'd,* 139 S. Ct. 1148 (2019) (ALJ reasonably interpreted lack of compliance with prescribed treatment as undermining claimant's credibility about the severity of his condition).  And the ALJ explicitly considered Wright's daughter's Third Party Adult Function Report, which he gave some weight despite finding that it was "not supported by the weight of credible medical evidence of record."  (*Id*., PageID.66).  The RFC prior to Wright's date of disability, despite allowing for some work, is quite restrictive and reflects the allegations from Wright and his daughter's testimony.  As summarized above, Wright was limited to sedentary work with additional postural limitations, and the mental RFC limited Wright to simple, routine tasks, occasional contact with co-workers, and no interaction with the public.  (*Id*., PageID.64).  This was not improper.  *See Ervin v. Comm'r of Soc. Sec.*, No. 2:15-CV-13352, 2017 WL 955129, at *3 (E.D. Mich. Mar. 13, 2017) (citing cases demonstrating that an RFC of "simple, routine tasks" can accommodate a claimant's moderate limitation in concentration, persistence, and pace).

32

Wright then criticizes the ALJ's reliance on the opinions of Dr. Brasseur, Dr. DeLoach, and Twaide Langham, D.O.  He notes that Dr. Brasseur is 93 years-old, otherwise retired, and "whose sole source of earned income is performing social security examinations for DDS."  (ECF No. 17, PageID.732-733).  This line of argument finds no support in the law.  To the extent Wright suggests bias, to sustain such a finding requires a "strong showing of bias."  *Blanton v. Soc. Sec. Admin.*, 118 F. App'x 3, 6 (6th Cir. 2004) (internal quotations omitted).  There is no indication in the record that Dr. Brasseur's conclusions were based on anything other than his examination of Wright.  *See Garver v. United States*, 846 F.2d 1029, 1031 (6th Cir. 1988).  An examining relationship with a claimant is considered positively under the Social Security regulations governing medical opinions.  20 C.F.R. § 404.1520c(c)(3)(v).

Similarly, Wright alleges that Dr. DeLoach "has been responsible for denying benefits to thousands of disabled and deserving SSI and SSD applicants over the past thirty years."  Federal or state agency medical consultants are considered to be qualified experts in Social Security disability evaluation.  20 C.F.R. § 404.1513a(b)(1); *see also Hoskins v. Comm'r of Soc. Sec.*, 106 F.App'x 412, 415 (6th Cir. 2004) ("State agency medical consultants are considered experts and their opinions may be entitled to greater weight if their opinions are supported

33

by the evidence."); *Miller v. Comm'r of Soc. Sec.*, 811 F.3d 825, 834 (6th Cir.

2016) ("To be sure, state agency medical consultants ... are 'highly qualified

physicians and psychologists who are experts in the evaluation of the medical

issues in disability claims under the [Social Security] Act.' ") (quoting SSR 96–6p,

1996 WL 374180, at *2 (July 2, 1996)).  The Sixth Circuit has held that state

agency reviewing physicians such as Dr. DeLoach in fact "have the strongest

claims to neutrality." *Lucido v. Barnhart*, 121 F. App'x 619, 622 (6th Cir. 2005).

Wright is correct that Dr. DeLoach had not reviewed every record, as his

February 1, 2017 opinion pre-dated many of them including voluminous records

from Saginaw County Community Mental Health Authority.  This is relevant to an

ALJ's analysis and weight of a medical reviewer's opinion, but Wright fails to

show how his opinion is contradicted by later records, or point to a medical

opinion from a later date that conflicts with this opinion.

The ALJ's decision reflects an analysis of the entire medical record from

Wright's alleged onset date to the date of the decision, and he found Dr.

DeLoach's opinion to be "somewhat consistent" with that record, assigning it some

weight.  (ECF No. 13, PageID.66).  Reviewing the record, the undersigned finds

this analysis supported by substantial evidence.  As noted above, Wright was

generally found to have normal speech, behavior, judgment, and thought content in

visits with Dr. Gerold, (*Id.*, PageID.433, 435, 437), appropriate dress, adequate grooming and hygiene, cooperative behavior, normal speech, goal directed and logical thought process, and fully oriented with intact memory, attention, concentration, and language in records from Dr. Jafferany's office, (*Id.*, PageID. 461-464, 468-469, 474-475, 509-510), and in his last record from the Saginaw County Community Mental Health Authority, Wright was found cooperative, with a linear and coherent thought process; normal speech; was alert; oriented to person, time, situation, and place; and had good insight and fair judgment. (*Id.*, PageID.657-658). Thus, substantial evidence suggests that Dr. DeLoach's opinion had the two "most important factors" – supportability and consistency – in its favor. 20 C.F.R. § 404.1520c(b)(2), (c)(1) and (2).

Wright criticizes the opinion of Dr. Langham that found Wright to lack a severe impairment, but the ALJ takes issue with this opinion for the same reason. (*Id.*, PageID.65). The ALJ found that contrary to Dr. Langham's opinion, "the objective medical record clearly establishes that the claimant has severe physical impairments. (*Id.*). For this reason, the ALJ afforded little weight to the opinion. (*Id.*). Delving further into the specifics of Dr. Langham's opinion is unnecessary, as it did not appear to factor into the ALJ's decision. To the extent that Wright takes issue with the ALJ not relying on any opinion in formulating the physical

RFC, "[n]o bright-line rule exists in our circuit directing that medical opinions must be the building blocks of the [RFC] finding"; the ALJ need only "make a connection between the evidence relied on and the conclusion reached." *Tucker v. Comm'r of Soc. Sec.*, 775 F. App'x 220, 226 (6th Cir. 2019); *see also Mokbel-Aljahmi v. Comm'r of Soc. Sec.*, 732 F. App'x. 395, 401 (6th Cir. 2018) ("We have previously rejected the argument that a residual functional capacity determination cannot be supported by substantial evidence unless a physician offers an opinion consistent with that of the ALJ.") (citing *Shepard v. Comm'r of Soc. Sec.*, 705 F. App'x 435, 442-43 (6th Cir. 2017) (rejecting the argument that "the ALJ's RFC lacks substantial evidence because no physician opined that [the claimant] was capable of light work")); *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 728 (6th Cir. 2013) (rejecting the same argument because "the ALJ is charged with the responsibility of determining the RFC based on her evaluation of the medical and non-medical evidence"). An ALJ is "entitled to create an RFC based on his evaluation of the available medical evidence." *Sparrow v. Comm'r of Soc. Sec.*, No. 15-CV-11397, 2016 WL 1658305, at *7 (E.D. Mich. Mar. 30, 2016), *report and recommendation adopted*, 2016 WL 1640416 (E.D. Mich. Apr. 26, 2016). Further, it is Wright's burden to show that a more restrictive RFC is warranted at this stage. *Her*, 203 F.3d at 391.

Wright further contends that at Step Five of the analysis, the ALJ ignored the VE's testimony that missing excessive days from work due to absenteeism and being off task for more than 15% of the workday were work preclusive.  (ECF No. 17, PageID.735-736).  To the contrary, the ALJ specifically relied on this evidence in finding that beginning on June 17, 2018, when he added missing four or more days of work per month to the RFC, that Wright would no longer be able to work.  (ECF No. 13, PageID.66-69).  As for being off task, the attorney representing Wright at hearing prompted this answer from the VE; the ALJ never suggested or incorporated such a limitation into the RFC.  Wright has not demonstrated that he would be off task more than 15% of the workday, or that prior to June 17, 2018, Wright would miss four or more days of work per month.

### D.    Date of Disability

Additionally, Wright challenges the ALJ's date of disability of June 17, 2018, arguing that while this is the date that a cervical spine MRI showed degenerative changes and severe spondylotic compromise, Wright would necessarily have been suffering from this impairment prior to that date.  The Commissioner responds that while this may be "the type of record that arguably would support different dates for disability onset," June 17, 2018, cannot be said to

be "unsupported by substantial evidence." *Miller v. Sec'y of Health & Hum. Servs.*, 843 F.2d 221, 224 (6th Cir. 1988).

Regarding Wright's records from prior to June 17, 2018, the ALJ found the following:

> The claimant's degenerative disc disease of the lumbar and cervical spine, degenerative joint disease of the right shoulder, degenerative joint disease of the left hip – post-arthroplasty were not disabling prior to the established onset date. Diagnostic imaging results of the claimant's hips and right shoulder from April and May 2018 respectively revealed no real issues with the claimant's hips with only slight heterotrophic ossification in the claimant's left hip (11F/3-6; 13F/13). The claimant had normal range of motion at treatment visits and at his March 2017 consultative examination (7F/9; 8F). The claimant had full strength and no AC joint or bicep head tenderness (16F/7). The claimant has consistently had a normal gait (8F; 16F/8). As late as May 2018, the claimant had good range of motion in his right shoulder (13F/7). The claimant could perform several activities of daily living at his consultative examination (8F).

(ECF No. 13, PageID.64-65).

Regarding Wright's assessed RFC from June 17, 2018 on, the ALJ reasoned:

> The objective medical evidence supports the claimant's allegations of disabling symptoms. Diagnostic imaging results of the claimant's right shoulder from April 2018 revealed a chronic tear with moderate osteoarthritis in the claimant's right acromioclavicular joint. Diagnostic imaging results of the claimant's lumbar and cervical spine from June 2018 revealed severe narrowing at L5-Sl and severe degenerative changes (l lF/3-6). On examination, the claimant's providers made the following findings: chronic shoulder pain, multiple joint pain, and decreased shoulder range of motion (16F). These findings, in combination with the opinion evidence discussed below, support a residual functional capacity for sedentary work.

(ECF No. 13, PageID.67).

In making the case that the Court should defer to the ALJ's onset date, the Commissioner slightly misrepresents *Miller*, stating that in *Miller* "the court deferred to the November 1, 1982 onset date found by the agency, where a treating physician offered a November 5, 1982 opinion supported by pulmonary function testing." (ECF No. 20, PageID.774). However, the ALJ in *Miller* had found disability onset at a later date, the district court reasoned that the onset of disability onset approximately two and a half years earlier, and the Commissioner did not challenge the earlier date on appeal. *Id*. at 222. Thus, the district court did not defer to the agency's initial date of onset. On appeal, the Sixth Circuit found that the Commissioner, "by not cross-appealing, has, in effect, adopted this date chosen by the district court for disability onset purposes." *Id*. at 224 n.3. Regardless, *Miller* provides support for setting the date of onset at the date that evidentiary support for the disability finding is available. This constitutes substantial evidence for the date of onset, and Wright would have the burden to show that an earlier date is warranted. *Preslar*, 14 F.3d at 1110 (the burden of proof is on the claimant throughout the first four steps); *Her*, 203 F.3d at 391 (same).

Additional support for the ALJ's decision can be found in *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 838 (6th Cir. 2006). In *McClanahan*, a July

27, 2001 examination revealed organic brain dysfunction in the claimant, who

sought disability benefits for depression among other ailments. *Id*.  Though the

brain dysfunction was most likely present prior to that date, there was no evidence

as to how early it developed or when it became disabling. *Id*. at 838-839.  As here,

"the ALJ properly relied upon the findings of the state disability medical

consultant's opinion as well as the rest of the record to find that [the claimant's

impairment] was not disabling any time prior to [the date of examination]." *Id*. at

839.  The Court also reiterated that "[the claimant's] assertion that the ALJ had the

burden of proof to establish the onset date is unsupported by any legal authority,

and runs counter to the general regulatory burden of proof that requires claimants

to prove their disability to the Commissioner." *Id*. at 837 (citing 20 C.F.R. §

404.1512(a)).

As noted in *McClanahan*, the determination of disability onset date is

governed by Social Security Ruling 83–20, which states:

> Factors relevant to the determination of disability onset include the
> individual's allegation, the work history, and the medical evidence.
> These factors are often evaluated together to arrive at the onset date.
> However, the individual's allegation or the date of work stoppage is
> significant in determining onset *only if it is consistent with the severity
> of the condition(s) shown by the medical evidence*.

*Titles II & Xvi: Onset of Disability*, SSR 83-20 (S.S.A. 1983) (emphasis added).

"The medical evidence serves as the primary element in the onset determination."

40

*Id.*  Based on this guidance, cases in this district have found that where the record

contains medical evidence relating to the relevant time period, the ALJ may rely on

that evidence in determining the disability onset date.  *See, e.g., Sharay v. Comm'r*

*of Soc. Sec.*, No. 15-12531, 2016 WL 8114220, at *9 (E.D. Mich. Aug. 28,

2016), *report and recommendation adopted sub nom. Sharay v. Colvin*,  2016 WL

5539791 (E.D. Mich. Sept. 30, 2016); *Freeman v. Comm'r of Soc. Sec.*, No. 14-

CV-11146, 2015 WL 404332, at *11 (E.D. Mich. Jan. 29, 2015); *see also Yosowitz*

*v. Colvin*, No. 1:15CV2382, 2016 WL 5173319, at *18 (N.D. Ohio Sept. 1,

2016), *report and recommendation adopted,*  2016 WL 5076076 (N.D. Ohio Sept.

20, 2016) ("As in *McClanahan*, the ALJ in the instant case was not faced with a

situation where 'there is no development of the medical record on which ... to

ascertain onset.'  To the contrary, here, the medical record contained treatment

notes, ER records, and objective test results regarding Yosowitz's severe

impairments during the relevant time period, which were thoroughly reviewed the

ALJ in rendering his disability determination." (quoting *McClanahan* at 836-837)).

Here, the record was replete with objective and opinion evidence from the

relevant time period before the ALJ's onset date, which the ALJ thoroughly

considered.  Wright has not met his burden in showing that the onset date was

unsupported by substantial evidence.  Thus, the RFC, including the date of onset

based on Wright's June 2018 MRI results, is supported by substantial evidence, and should be upheld.

### E.     Remedial Nature of the Act

Lastly, Wright argues that the ALJ's partial denial of benefits is contrary to the remedial underpinnings of the Act.  He emphasizes his willingness to work despite having a torn rotator cuff before the alleged onset date; putting off shoulder surgery in order to avoid missing more work after his hip surgery; and his general record of gainful employment.  However, he does not support this argument with any legal authority that would compel the undersigned to recommend remand based on these facts.

In addressing a similarly vague argument regarding the nature of the Act, one court stated:

> Nothing in the record suggests that plaintiff was put to a more rigorous standard of proof than that required by statute and regulation.  This Court quite agrees with plaintiff that the Social Security Act is remedial in nature and to be construed liberally.  *See, e.g., Polly v. Gardner,* 364 F.2d 969 (6th Cir. 1966).  But that is a question quite apart from SSA's responsibility to insist on the regularity and the accuracy of documents submitted as evidence supporting a claim.
> It is the claimant's responsibility to obtain and provide the evidence needed to prove eligibility or the right to continue to receive benefit payments.

*Pallas v. Sec. of HHS*, No. 89-0246, 1990 WL 357095, at *3 (E.D. Mich. Feb. 28, 1990).  *See also Spooner v. Comm'r of Soc. Sec.*, No. 19-CV-13379, 2021 WL

42

1175413, at *5 (E.D. Mich. Mar. 29, 2021) (objection to R&R that Magistrate Judge "wholly ignored the remedial underpinnings of the disability provisions of the Social Security Act" amounted to nothing more than a generalized objection to the entire R&R).

Additionally, Wright's work history alone, even if exemplary, would simply be one factor in favor of credibility and does not entitle Wright to "substantial credibility" or shift the burden of proof for disability.  *Sorrell v. Comm'r of Soc. Sec.*, 656 F. App'x 162, 174 (6th Cir. 2016).  Wright provides no independent reason here to consider remand of the ALJ's decision, as the appropriate standards of proof have been applied in this Court's analysis of Wright's prior arguments.

## VI.    Conclusion

For the reasons set forth above, it is RECOMMENDED that the Commissioner's motion be GRANTED, Wright's motion be DENIED, and that under sentence four of 42 U.S.C. § 405(g), the Commissioner's decision be AFFIRMED.


Dated: August 6, 2021                                   s/Kimberly G. Altman
Detroit, Michigan                                       KIMBERLY G. ALTMAN
                                                        United States Magistrate Judge

## NOTICE TO PARTIES REGARDING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation. Any objections must be filed within 14 days of service, as provided for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule 72.1(d). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 144 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505, 508 (6th Cir. 1991). Filing objections that raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers, Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Under Local Rule 72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," and "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to

44

Objection No. 2," etc.  If the Court determines that any objections are without

merit, it may rule without awaiting the response.

## **<u>CERTIFICATE OF SERVICE</u>**

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on August 6, 2021.

<u>s/L. Hosking on behalf of Marie E. Verlinde</u>
Case Manager